IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**EMILEE ELSON,**

    **Plaintiff,**

                                          Civil Action 2:15-cv-02419
                                          JUDGE MICHAEL H. WATSON
                                          Magistrate Judge Jolson

**COMMISSIONER OF SOCIAL
SECURITY,**

    **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Emilee Elson, filed this action under 42 U.S.C. §§ 405(g) and 1383(c) seeking review of the Commissioner of Social Security's (the "Commissioner") denial of her application for disability insurance benefits and supplemental social security income. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's statement of errors be **OVERRULED** and judgment be entered in favor of the Commissioner.

### I. BACKGROUND

**A. Prior Proceedings**

Plaintiff applied for disability insurance benefits on August 6, 2012, and for supplemental social security income on August 3, 2012. (Doc. 10-2 at Tr. 27, PAGEID #: 74). She initially alleged that she became disabled on June 15, 2008, but later amended her onset date to November 26, 2012. (Doc. 10-5 at Tr. 243, PAGEID #: 293). Her date of last insured was December 31, 2013. After initial administrative denials of her claim, Plaintiff's case proceeded to a hearing before an Administrative Law Judge ("ALJ") on January 27, 2014. The ALJ denied

benefits on February 28, 2014. That decision became final when the Appeals Council denied review on April 23, 2015. Plaintiff then brought this action. (*See* Doc. 10 (administrative record); Doc. 13 (statement of errors); Doc. 18 (the Commissioner's response); Doc. 19 (Plaintiff's reply)).

**B. The Record**

    1. **Plaintiff's Testimony**

Plaintiff was 36 at the time of the administrative hearing. She has a high school education and formerly worked as a telemarketer before getting laid off. (Doc. 10-2 at Tr. 54, PAGEID #: 101). She initially looked for work after the layoff, but her medical issues worsened. (*Id.* at Tr. 55, PAGEID #: 102). She testified that she is now unable to work due to back issues, left knee pain, high blood pressure, possible fibromyalgia, arthritis in her shoulder, and urinary incontinence. (*Id.* at Tr. 56–57, PAGEID #: 103–04).

Plaintiff's statement of errors centers on her mental health and incontinence. She testified about both at the administrative hearing. Regarding her mental health, Plaintiff testified that she goes to counseling at Six County and takes medication for her depression and anxiety. (*Id.* at Tr. 68, PAGEID #: 115). She testified that the counseling and medication "help[] some." (*Id.* at Tr. 68, 69, PAGEID #: 115, 116). Despite this, Plaintiff feels she is unable to return to her telemarketing job in part because she is unable to handle the stress of work. (*Id.* at Tr. 70, PAGEID #: 117).

As for her incontinence, Plaintiff testified that she has trouble traveling long distances because of her frequent need to use the restroom. (*See id.* at Tr. 60, PAGEID #: 107). She also testified she uses the restroom 13 to 15 times per day, and as many as 20 times in a day when she has a "flare-up[]." (*Id.* at Tr. 60–61, PAGEID #: 107–108). According to her testimony, the

issue had grown worse in the years leading up to the hearing (*id.* at Tr. 73, PAGEID #: 120), and had gotten bad enough near the time of the hearing that she tried not to leave her house (*see id.* at Tr. 61, PAGEID #: 108).

    2. **The Medical Records**

        a. **Mental Health**

The primary record addressing Plaintiff's mental health is the consultative report from Amynda Rhodes, a psychologist who conducted a clinical interview with Plaintiff on October 15, 2012. (*See* Doc. 10-7 at Tr. 446, PAGEID #: 490).

Plaintiff reported to Ms. Rhodes that she had been experiencing "some depression" and that "[s]ome days are better than others." (*Id.* at Tr. 446, PAGEID #: 499). Ms. Rhodes noted that Plaintiff took medication for anxiety and that Plaintiff "endorsed a history of mental health problems related to depression and anxiety." (*Id.* at Tr. 448, PAGEID #: 448). Ms. Rhodes' report further notes that Plaintiff "denie[d] seeing a mental health professional in the past or current." (*Id.*). Plaintiff told Ms. Rhodes that she "has a lot of crying spells [and] feels hopeless and helpless" (*id.*); the report noted that Plaintiff "presented as depressed" with a "tearful" "affect" (*id.* at Tr. 449, PAGEID #: 502). According to Ms. Rhodes' account, Plaintiff described symptoms consistent with depression over the past four years (*see id.* at Tr. 449–50, PAGEID #: 502–03), as well as having problems with irritability (*see id.* at Tr. 550, PAGEID #: 503). The report also contains a short paragraph describing symptoms "indicati[ve] of anxiety, as evidenced by apprehension and worry about her medical condition." (*Id.*). Based on all of this, Ms. Rhodes assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 61 and concluded Plaintiff had dysthymic disorder.

Ms. Rhodes further noted that: all of Plaintiff's cognitive abilities were average; Plaintiff

3

did not describe issues with memory or attention at work; she did not describe any issues with authority figures; she would have no problem performing simple and multi-step tasks; and, by Plaintiff's own admission, she would have no problem with her irritability in a work-place setting. (*See id.* at Tr. 452–53, PAGEID #: 505–06). Ms. Rhodes did opine that Plaintiff's pace of work might "be slower due to fatigue, physical issues, and stress" (*id.* at Tr. 452, PAGEID #: 505), and further speculated that Plaintiff's issues with depression "could compromise [her] ability to work [under] pressure[] and could lead to increased emotional instability and withdrawal" (*id.* at Tr. 453, PAGEID #: 506).

Treatment notes from one of Plaintiff's treating physicians, Dr. Arthur Papadopol, show that Plaintiff did not mention any mental-health issues in February of 2013. (Doc. 10-7 at Tr. 506, PAGEID #: 559). A few months later, Plaintiff requested Xanax because her mother died the week prior. (*Id.* at Tr. 506, PAGEID #: 557). In August of 2013, she reported her anxiety was "doing a little better" (*id.* at Tr. 502, PAGEID #: 555), and on September 16, 2013, reported that her symptoms remained stable (*id.* at Tr. 500, PAGEID #: 553).

Plaintiff also sought mental-health treatment from Six County in the fall of 2013. On September 27, 2013, Plaintiff reported depression and anxiety related to various family issues (including her father's death two years prior, her mother's death, and a dispute with her brother). (*See, e.g.*, *id.* at Tr. 607, PAGEID #: 660). The intake social worker diagnosed Plaintiff with major depressive disorder. (*Id.* at Tr. 613, PAGEID #: 666). Plaintiff returned to Six County twice more. On October 10, 2013, she reported that her stress levels had decreased and that she was feeling better about all of the problems cited above. (*See, e.g.*, *id.* at Tr. 616,  PAGEID #: 669). Plaintiff again had a positive visit on November 11, 2013, reporting improvement in her mental health, including that she "fe[lt] much more in control of life." (*Id.* at Tr. 617, PAGEID

4

#: 670).

Two state-agency reviewers commented on Plaintiff's mental impairments. Mel Zwissler, Ph.D., gave Dr. Rhodes's opinion "great weight," finding her opinion supported by Plaintiff's medical evidence. (Doc. 10-3 at Tr. 99, PAGEID #: 147). He too found Plaintiff's mental-health issues non-severe. (*Id.* at Tr. 98, PAGEID #: 146). Kristen Haskins, Psy.D., made essentially the same findings upon reconsideration of the record. (*See id.* at Tr. 125–27, PAGEID #: 173–75).

      b. **Incontinence**

Plaintiff saw one of her treating physicians, Dr. Parekh, on February 6, 2013, to evaluate her urinary issues. (*See, e.g.*, Doc. 10-7 at Tr. 632, PAGEID #: 686). Dr. Parekh indicated then that Plaintiff "has obvious stress incontinence with straining" and "urinary urgency with urge incontinence." (*Id.* at Tr. 633, PAGEID # 687). Plaintiff next underwent a diagnostic procedure for her bladder issues on February 19, 2013. (*See id.* at Tr. 585, PAGEID #: 638). She saw Dr. Parekh for a follow-up visit on March 4, 2013, where she reported that she had implemented some of the Doctor's suggestions, like diet management, fluid management, and exercises, to improve her bladder issues. (*See id.* at Tr. 643, PAGEID #: 697). Dr. Parekh's notes from the follow-up visit indicate continued incontinence, as well as a normal voiding function. (*See id.*). Plaintiff returned to Dr. Parekh in October of 2013, to discuss her urinary issues, this time reporting some degree of incontinence, albeit with improvement she attributed to the exercises she had been doing. (*See id.* at Tr. 648, PAGEID #: 702). Dr. Parekh again noted that Plaintiff's voiding function was normal. (*Id.* at 649, PAGEID # 703).

The record also includes reports from state-agency reviewing physicians. The state-agency reviewers considered all of Plaintiff's alleged ailments, but did not find any—including

her incontinence—to be severe. (Doc. 10-3 at Tr. 98, 111, 126, 141, PAGEID #: 146, 159, 174, 189).

Finally, the record contains a voiding diary that Plaintiff kept. The diary includes entries spanning from February of 2013, to February of 2014. Plaintiff, according to her diary, went to the restroom anywhere from 8 to 15 times in a day, depending on the day, during that span. The majority of the days in Plaintiff's diary indicate that she went to the bathroom from 9 to 12 times in a 24-hour span. (*See* Doc. 10-3 at Tr. 295–307, PAGEID #: 346–58).

### 3. The Vocational Testimony

Dr. John Finch testified as the vocational expert at Plaintiff's administrative hearing. (*See* Doc. 10-2 at 77, PAGEID #: 124). He and the ALJ had the following exchange relevant to Plaintiff's incontinence:

> Q . . . . Let's talk about the issue of using the bathroom on a frequent basis. If somebody needed to use a bathroom every hour, how would that play into work environment?
> A Well, I believe that the—let me say this: The higher the skill level, the easier it would be for a person to make that adjustment in a workplace. The lesser the skill level, it would—particularly at the unskilled level, I believe it would be work-preclusive.
> Q So, if an individual—if I did give that hypothetical individual at the light job to somebody who indicated that [she] would have to take breaks of every hour to use a restroom break, would that change your answer that—
> A At this, even at this level, at the low end of semiskilled, I think it probably would preclude that work.

(*Id.* at Tr. 80–81, PAGEID #: 127–28).

### 4. The ALJ's Decision

The ALJ found, first, that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013. Next, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the onset date of November 26, 2012.

In the second step of the sequential evaluation process, the ALJ concluded that Plaintiff had the following severe impairments: obesity, degenerative disc disease, asthma, carpal tunnel syndrome, "status post left release surgery," and bursitis of the left shoulder. (Doc. 10-2 at Tr. 29, PAGEID # 76). The ALJ found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments. (*See* 20 C.F.R. Part 404, Subpart P, Appendix 1).

Regarding the impairments at issue, the ALJ found that Plaintiff's mental-health concerns and her incontinence did not qualify as severe. As to her mental health, the ALJ discussed Plaintiff's treatment at Six County, which included her marked improvement over the months she sought treatment there. (*See, e.g.*, Doc. 10-2 at Tr. 31, PAGEID #: 77). In considering her incontinence, he noted that Plaintiff submitted a voiding diary to Dr. Parekh; he cited Dr. Parekh's treatment of Plaintiff "for urinary frequency/urgency"; he noted that Plaintiff "underwent a bladder procedure after her physical examination which was found to be unremarkable"; and he noted that "[t]he evidence of record is devoid of any further treatment" after the bladder procedure. (*Id.*). Considering all of this, the ALJ concluded that Plaintiff's mental-health issues and incontinence were not severe, explaining that she was "treated conservatively for these conditions and [that] no treating or examining physician has imposed restrictions that would preclude work activity." (*Id.*)

In turning to the analysis of Plaintiff's residual functional capacity ("RFC"), the ALJ primarily considered Ms. Rhodes' opinion in addressing Plaintiff's mental-health concerns. He summarized the report, noted the GAF score Ms. Rhodes assigned Plaintiff, gave weight to Ms. Rhodes' opinion that Plaintiff suffered mild symptoms associated with her dysthymic disorder (because the "opinion" was "generally consistent with the evidence of record" (Doc. 10-2 at Tr.

7

35, PAGEID #: 82)), and gave little weight to Ms. Rhodes' opinion that Plaintiff would likely perform tasks at a slower rate due to fatigue, physical issues, and stress (because it was "not supported by the record" (*id.*)).

The RFC analysis also addressed Plaintiff's incontinence. The ALJ noted that Plaintiff "report[ed] experiencing a frequent need to urinate and urinary incontinence." (*Id.* at Tr. 33, PAGEID #: 80). The ALJ further noted that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms," but found that the medical evidence of record did not support Plaintiff's own claims regarding the frequency, duration, and severity of her pain and attendant symptoms. (*Id.*). The ALJ also stated that he considered the state-agency reviewing physicians' reports. (*See id.* at Tr. 35, PAGEID #: 82; *see also* Doc. 10-3 at Tr. 92, 105, 118, 133, PAGEID #: 140, 153, 166, 181). The ALJ concluded that while the record did "establish[] underlying medical conditions capable of producing some pain or other limitations," "the substantial evidence" nevertheless supported the conclusion that Plaintiff's conditions were not so severe as to establish "disabling pain or other limitations." (Doc. 10-2 at Tr. 36, PAGEID #: 83). In light of all of this, the ALJ concluded that "Plaintiff experiences no greater than, at most, mild to moderate functional limitations upon her ability to perform basic work activities." (*Id.*).

Finally, the ALJ found that Plaintiff's ability was consistent with the demands of her past job as a telemarketer, and he consequently decided that Plaintiff was not entitled to benefits.

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *TNS, Inc. v. Nat'l Labor Relations Bd.*, 296 F.3d 384, 395 (6th Cir. 2002).

### III. DISCUSSION

Plaintiff argues that the ALJ erred in concluding that her mental-health issues and incontinence were not severe impairments. She further contends that the error was not harmless because the RFC analysis failed to account properly for any attendant limitations.

**A. Mental Health**

**1. The ALJ's Finding that Plaintiff's Mental-Health Issues Were Not Severe**

"[A]n impairment is considered 'severe' unless" it "has no more than a minimal effect on [the claimant's] physical or mental abilit[ies] to perform basic work activities." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 324 (6th Cir. 2015). According to the Sixth Circuit, "the claimant's burden of establishing a 'severe' impairment during the second step of the disability determination process is a *de minimis* hurdle." *Id.* at 324–25 (internal quotation marks omitted). Under this view, "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id.* at 325. In this case, the issue is not whether this Court would come out differently on the severity determination, but whether substantial evidence supports the ALJ's finding. *See Reed v. Colvin*, No. CIV. 13-54-GFVT, 2014 WL 318569, at *3 (E.D. Ky. Jan. 29, 2014) ("The limited

9

nature of substantial evidence review prevents the reviewing court from substituting its judgment for that of the ALJ.").

Here, the ALJ discussed Plaintiff's treatment for depression, and then later went on to discuss in more depth the report Ms. Rhodes issued after meeting with Plaintiff. Based on the treatment records, the ALJ found that Plaintiff's depression was not severe. (*See* Doc. 10-2 at Tr. 30, PAGEID #: 77).

Contrary to Plaintiff's arguments, the record contains substantial evidence supporting the ALJ's conclusion. For example, the ALJ noted that the evidence indicated only "intermittent complaints of depression" to her healthcare providers. (*Id.* at Tr. 30, PAGEID #: 77). The record supports the ALJ. For example, Plaintiff reported some level of depression or anxiety to a treating source in May of 2013 (*see* Doc. 10-7 at Tr. 504, PAGEID #: 557), and subsequent follow-up visits in August and September of that year indicate improvement in Plaintiff's condition (*see id.* at Tr. 500, 502, PAGEID #: 553, 555). The remainder of the mental-health record in this case is slight, and includes only Ms. Rhodes' report (which she issued in response to the social security process), Plaintiff's own testimony at the administrative hearing, and a few additional treatment notes discussed below.

Regarding the additional treatment notes, the ALJ noted that Plaintiff sought mental-health treatment at Six County in the latter part of 2013. Those notes indicate that Plaintiff reported feelings of depression and anxiety related to various family issues. (*See, e.g.*, *id.* at Tr. 607, PAGEID #: 660). However, the record supports the ALJ's statement that subsequent "[t]reatment notes reflect the claimant enjoying significant improvement in her situation with dealing with the[se] family issue[s]." (Doc. 10-2 at Tr. 30, PAGEID #: 77; *see also, e.g.*, Doc. 10-7 at Tr. 616, PAGEID #: 669 (treatment notes from October 10, 2013, indicating that Plaintiff

10

reported decreased stress levels and that she was feeling better about all of the problems she cited previously); *id.* at Tr. 617, PAGEID #: 670 (treatment notes from November 11, 2013, noting Plaintiff's improvement in mental health, including that she "fe[lt] much more in control of life")).

The ALJ further concluded that Plaintiff's condition of "dysthymic disorder/major depressive disorder does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities." (Doc. 10-2 at Tr. 30, PAGEID #: 77). The record also supports this statement. According to Ms. Rhodes' report, for example, Plaintiff had not ever seen a mental-health professional at the time of her consultation with Plaintiff in the fall of 2012. (*See* Doc. 10-7 at Tr. 448, PAGEID #: 448). Ms. Rhodes further noted that all of Plaintiff's cognitive abilities were average; that Plaintiff did not describe issues with memory or attention at work; that she did not describe any issues with authority figures; that she would have no problem performing simple and multi-step tasks; and that, by her own admission, Plaintiff would have no problem with her irritability in a work-place setting. (See *id.* at Tr. 452–53, PAGEID #: 505–06). All of this qualifies as substantial evidence to support the ALJ's conclusion that Plaintiff's mental-health concerns only minimally affected her work ability, and that her mental-health problems did not rise to the level of severe.

Plaintiff's counterarguments do not convince the Court otherwise. With one, she attacks various aspects of Ms. Rhodes' report. She argues, for example, that the report is of limited value because it focuses too much on Plaintiff's skill set from the past (when she had a job), and not the present (when she does not). And she argues that the ALJ erred in failing to correct the Ohio Bureau of Disability Determination's standard guiding consultative examinations, which, as Plaintiff sees it, prejudiced Ms. Rhodes' opinion. Neither attack undermines Ms. Rhodes'

11

opinion. Moreover, it would have been error for the ALJ wade into the wisdom of every turn of Ms. Rhodes' report. *See Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 494 (6th Cir. 2011) (citing *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) (noting that ALJs must resist the "temptation to play doctor")).

In addition, the record indicates few instances of Plaintiff seeking mental-health treatment, and marked improvement in a short time when she did. (*See, e.g.*, Doc. 10-7 at Tr. 616, PAGEID #: 669; *id.* at Tr. 617, PAGEID #: 670; *see also* Doc. 10-3 at Tr. 98–99, 106–07, 111–12, 125–27, 136, 140–42, PAGEID #: 146–47, 154–55, 159–60, 173–75, 184, 188–90 (state-agency reviewing psychologists concluding that Plaintiff did not have any mental limitations that qualified as severe)). This amounts to substantial evidence by itself to support the ALJ's conclusion, negating Plaintiff's counterarguments regarding Ms. Rhodes' report, as well as Plaintiff's remaining arguments in favor of remand on this point. (*See* Doc. 13 at PAGEID #: 752–53 (Plaintiff arguing that the "ALJ err[ed] by agreeing with a medical source's assessment, yet declining to include all of the assessed limitations" in posing hypotheticals to the vocational expert)); *but see Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) (noting that an argument like Plaintiff's only applies where, unlike here, the vocational expert's testimony serves as part of the substantial-evidence calculation).

### 2. Harmless Error

Assuming, for the sake of argument, the ALJ improperly found Plaintiff's mental-health issues non-severe, the Commissioner argues that such an error was harmless.

An error on a severity determination is harmless where the ALJ goes on to "consider[] all of plaintiff's impairments (both severe and non-severe) in determining plaintiff's RFC" and "properly account[s] for the limitations imposed by both." *Angelo v. Comm'r of Soc. Sec.*, No.

1:12-CV-169, 2013 WL 765646, at *6 (S.D. Ohio Feb. 28, 2013), *report and recommendation adopted*, No. 1:12-CV-00169, 2013 WL 1344841 (S.D. Ohio Apr. 2, 2013); *see Johnson v. Comm'r of Soc. Sec.*, No. 2:14-CV-306, 2015 WL 686298, at *5 (S.D. Ohio Feb. 18, 2015), *report and recommendation adopted sub nom. Johnson v. Colvin*, No. 2:14-CV-306, 2015 WL 1286536 (S.D. Ohio Mar. 18, 2015) (noting that the issue at this stage is "whether any symptoms attributed to Plaintiff's [impairment] were accommodated by the ALJ's residual functional capacity finding").

The ALJ met this standard. In walking through the RFC analysis, the ALJ devoted a paragraph to discussing Plaintiff's potential mental-health limitations (*see* Doc. 10-2 at Tr. 45, PAGEID #82), which indicates that the ALJ "considered all of plaintiff's impairments (both severe and non-severe)." *Angelo*, 2013 WL 765646, at *6. Plaintiff responds that the ALJ erred nonetheless when he discounted Ms. Rhodes' opinion that Plaintiff would be likely to perform tasks at a slower rate due to her fatigue, physical issues, and stress. This argument does not change anything. The ALJ's RFC analysis assumed Plaintiff suffered "mild to moderate functional limitations upon her ability to perform basic work activities." (*Id.* at Tr. 36, PAGEID #: 82). That level of limitation is consistent with the record, including Ms. Rhodes' report and her analysis of Plaintiff's potential on-the-job performance. (*See, e.g.*, Doc. 10-7 at Tr. 448, PAGEID #: 501).

For these reasons, any error in finding Plaintiff's mental-health issues non-severe was harmless.

### B. Incontinence

#### 1. The ALJ's Finding that Plaintiff's Incontinence Was Non-Severe

Plaintiff contends that the ALJ erred in finding her incontinence non-severe. Again, the

question here is not whether this Court can or should substitute its own judgment.  The question is whether the ALJ's conclusion is supported by substantial evidence.  The answer is yes.

The ALJ considered that no treating or examining physician imposed restrictions that would preclude work activity.  (*See* Doc. 10-2 at Tr. 30, PAGEID #: 77).  Contrary to Plaintiff's argument, this was within his authority.  *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition. The doctors' reports are silent regarding any limitation of joint motion, as well as the intensity, frequency, and duration of arthritic pain. We have upheld findings of no severe impairment in cases involving similar records." (citation omitted)); *cf. Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) ("The determination of a claimant's Residual Functional Capacity is a determination based upon the *severity* of his medical and mental impairments. This determination is usually made at stages one through four, *when the claimant is proving the extent of his impairments*." (emphasis added)).

The ALJ also noted that Plaintiff was treated conservatively for any incontinence issues. The record indicates, for example, that Plaintiff saw her treating physician a handful of times in 2013—twice in February, once in March, and once in October.  The results of those visits were mixed: one noted Plaintiff's incontinence (Doc. 10-7 at Tr. 632–33, PAGEID #: 686–87), one was for a diagnostic procedure (*id.* at Tr. 576–77, PAGEID #: 629–30), and the rest were follow-up visits indicating that Plaintiff had a normal voiding function and that Plaintiff's issues had improved since she started doing some of the exercises her doctor recommended (*see id.* at Tr. 643, PAGEID #: 697; *id.* at Tr. 648, PAGEID #: 702; *id.* at 649, PAGEID # 703), which supports the ALJ's conclusion.

Taken together, the evidence of record and the evidence the ALJ relied on is "more than a

14

scintilla of evidence" that "a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241 (internal quotation marks omitted). This meets the substantial-evidence bar and ends the Court's review of the matter.

Plaintiff resists this conclusion. She argues that the ALJ's consideration of the evidence was one-sided (*see* Doc. 13 at PAGEID #: 754–55), even though the ALJ cited Dr. Parekh's treatment notes and cited Plaintiff's voiding diary. She faults the ALJ's observation that the record does not contain a treating or examining physician's opinion on the extent of Plaintiff's incontinence issues and whether such issues posed any work-related limitations, even though the law allows him to do so. *See Higgs*, 880 F.2d at 863. Finally, she points to all the parts of the record that support her position as to the severity of her condition. (*See* Doc. 19 at PAGEID #: 775–77). Plaintiff is right that the record contains evidence cutting against the ALJ's conclusion. But the question at this stage is whether substantial evidence supports the ALJ's severity finding, and it does. *See Longworth v. Comm'r Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005) ("If substantial evidence supports the Commissioner's decision, [courts must] defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." (internal quotation marks omitted)).

### 2. Harmless Error

Even granting Plaintiff's argument that the ALJ erred in the severity determination, the error would be harmless.

Although the ALJ found Plaintiff's incontinence non-severe, he "considered all of plaintiff's impairments (both severe and non-severe) in determining plaintiff's RFC." *Angelo v. Comm'r of Soc. Sec.*, No. 1:12-CV-169, 2013 WL 765646, at *6 (S.D. Ohio Feb. 28, 2013) (emphasis added), *report and recommendation adopted*, No. 1:12-CV-00169, 2013 WL 1344841

(S.D. Ohio Apr. 2, 2013). For example, in walking through the RFC analysis he cited Plaintiff's reported "frequent need to urinate" and her "urinary incontinence." (Doc. 10-2 at Tr. 33, PAGEID #: 80). He also considered the state-agency reviewing physicians' reports, each of which addressed Plaintiff's urinary issues (*see id.* at Tr. 35, PAGEID #: 82; *see also* Doc. 10-3 at Tr. 92, 105, 118, 133, PAGEID #: 140, 153, 166, 181). Beyond considering Plaintiff's impairments, he "properly accounted for the limitations" her conditions might pose, *Angelo*, 2013 WL 765646, at *6—he found that her ailments could reasonably be understood to cause the symptoms she complained of (even if to a lesser extent than she alleged), and he concluded that "Plaintiff experiences no greater than, at most, mild to moderate functional limitations upon her ability to perform basic work activities" (Doc. 10-2 at Tr. 36, PAGEID #: 83), a conclusion supported by substantial evidence.

For these reasons, even if the ALJ's severity determination as to Plaintiff's incontinence were improper, any such error would be harmless.

## IV. CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's statement of errors be **OVERRULED** and that judgment be entered in favor of the Commissioner.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or

modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).  Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

    IT IS SO ORDERED.


Date: May 17, 2016　　　　　　　　　　　　　　/s/ Kimberly A. Jolson
　　　　　　　　　　　　　　　　　　　　　　　KIMBERLY A. JOLSON
　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE